**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SUNITA DODDAMANI,

*Plaintiff*,

*v.*

TODD BLANCHE, in his official capacity as Attorney General of the United States
950 Pennsylvania Avenue NW
Washington, D.C. 20530;

FRANCEY HAKES, in her official capacity as Director of the Executive Office for United States Attorneys
950 Pennsylvania Avenue NW
Washington, D.C. 20530;

JEROME F. GORGON, JR., in his official capacity as United States Attorney for the Eastern District of Michigan
211 W. Fort Street, Suite 2001
Detroit, MI 48226;

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, D.C. 20530;

EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS
950 Pennsylvania Avenue NW
Washington, D.C. 20530; and

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW
Washington, D.C. 20415,

*Defendants*.

**Case No.: __________**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff Sunita Doddamani is an exemplary, dedicated, and highly respected attorney who spent more than two decades serving the public at the federal, state, and local levels, including more than three years as an Assistant United States Attorney (AUSA) with the United States Attorney's Office (USAO) for the Eastern District of Michigan. Her work at the USAO consistently received outstanding performance reviews.

2. Among her responsibilities as an AUSA, Ms. Doddamani was assigned by USAO leadership in 2023 to join the trial team in *United States v. Zastrow*, No. 23-cr-20100 (E.D. Mich.), a successful prosecution of eight defendants for violations of the Freedom of Access to Clinic Entrances (FACE) Act, 18 U.S.C. § 248, and the federal civil rights conspiracy statute, 18 U.S.C. § 241. The FACE Act, among other things, criminally prohibits interference with access to reproductive health clinics.

3. Despite Ms. Doddamani's superb record, she was abruptly fired on April 13, 2026, without any advance notice, cause for her termination, or due process. Instead, she simply received an email with an attached letter from then-Acting Attorney General Todd Blanche notifying her that, effective immediately, she had been terminated "[p]ursuant to Article II of the United States Constitution and the laws of the United States."

4. The unstated reason for Ms. Doddamani's termination is retaliation based on her perceived political affiliation and beliefs, owing to her participation in the *Zastrow* prosecution at USAO leadership's direction. At least two other career prosecutors who had worked on FACE Act prosecutions during the Biden Administration were fired the same day as Ms. Doddamani. On the day of those firings, the U.S. Department of Justice (DOJ) publicly announced that it had "terminated the employment of personnel responsible for weaponizing the FACE Act who still

remained at the department." DOJ Rapid Response (@DOJRR47), X (Apr. 13, 2026, at 17:09 ET), https://perma.cc/9NWR-42VV. The next day, DOJ released a report providing a highly misleading account of supposed wrongdoing by the Department in enforcing the FACE Act during the Biden Administration.

5. The Civil Service Reform Act (CSRA) of 1978, 5 U.S.C. § 1101 *et seq.*, protects covered employees like Ms. Doddamani from arbitrary or discriminatory personnel actions, including actions taken on the basis of perceived political affiliation, and requires that personnel actions be based on merit and result from following established procedures. The CSRA thus safeguards Ms. Doddamani's ability as a civil servant to carry out her employment duties and to pursue justice without political fear or favor.

6. Ms. Doddamani's politically motivated and retaliatory termination violates the CSRA, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the First and Fifth Amendments.

## PARTIES

7. Plaintiff Sunita Doddamani served as an AUSA in the United States Attorney's Office for the Eastern District of Michigan from January 15, 2023, until April 13, 2026, when she was unlawfully terminated without notice, cause, or due process and in retaliation for her perceived political affiliation and beliefs.

8. Defendant Todd Blanche is the Attorney General of the United States. Blanche signed the "Memorandum for Sunita G. Doddamani," dated April 13, 2026, terminating Ms. Doddamani from federal service and thereby authorizing the unlawful and unconstitutional actions taken against her.

9. Defendant Francey Hakes is the Director of the Executive Office for United States Attorneys (EOUSA). On information and belief, Hakes carried out the unlawful and unconstitutional actions taken against Ms. Doddamani.

10. Defendant Jerome F. Gorgon is the United States Attorney for the Eastern District of Michigan. On information and belief, Gorgon carried out the unlawful and unconstitutional actions taken against Ms. Doddamani.

11. Defendant Executive Office of the President (EOP) is headquartered in Washington, D.C. and, on information and belief, authorized the unlawful and unconstitutional actions taken against Ms. Doddamani.

12. Defendant Executive Office for United States Attorneys is headquartered in Washington, D.C. and is a component of DOJ and an agency of the United States as defined by 5 U.S.C. § 701. EOUSA provides executive and administrative support for the 93 United States Attorneys. On information and belief, EOUSA carried out the unlawful and unconstitutional actions taken against Ms. Doddamani.

13. Defendant United States Department of Justice is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701. The Attorney General is the head of DOJ. 28 U.S.C. § 503. DOJ controls its components, including EOUSA.

14. Defendant Office of Personnel Management (OPM) is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701. On information and belief, OPM carried out the unlawful and unconstitutional actions taken against Ms. Doddamani.

**JURISDICTION AND VENUE**

15. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

16. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because several Defendants reside in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

17. Sovereign immunity is waived under 5 U.S.C. § 702, which entitles Ms. Doddamani to relief where Defendants acted unconstitutionally and beyond their statutory authority. *See also Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) (explaining that sovereign immunity does not apply to *ultra vires* claims).

## FACTS

### A. Ms. Doddamani's Career as a Respected and Accomplished Prosecutor

18. Prior to her unlawful termination on April 13, 2026, Ms. Doddamani had devoted her entire 22-year career to public service at the federal, state, and local levels.

19. Ms. Doddamani graduated from the University of Michigan in 2001 and from Wayne State University Law School, where she served as an editor on the *Wayne Law Review*, in 2004.

20. After law school, Ms. Doddamani became an Assistant Prosecuting Attorney with the Wayne County Prosecutor's Office, where she had already been working for a year as a law clerk. As a prosecutor in the office's General Trial Division, Ms. Doddamani prosecuted approximately 80 jury trials and 50 bench trials in cases involving homicides, robberies, firearm and drug offenses, and other violent felony criminal offenses. As one example, in 2010, Ms. Doddamani helped prosecute a first-degree murder and felony murder case, securing a conviction at trial and a sentence of life imprisonment for a defendant who tortured and beat his girlfriend to death. It was notably the first case in which a defendant was convicted under Michigan's felony-murder statute based on a predicate crime of torture.

21. In 2013, Ms. Doddamani was hired as an Assistant Prosecuting Attorney in the Macomb County Prosecuting Attorney's Office, in large part because of her noteworthy trial experience. There, she prosecuted serious felony offenses, including a hate-crime homicide, armed robbery, shooting, and assault cases, and she tried approximately 20 cases before a jury. The office quickly recognized Ms. Doddamani's impressive performance, rewarding her, in one instance, with three pay promotions in a single year.

22. In 2019, Ms. Doddamani joined the Michigan Department of the Attorney General (AG) as an Assistant Attorney General. She was specifically asked to lead what became the office's new Hate Crimes and Domestic Terrorism Unit as the unit chief. At the Michigan AG's office, Ms. Doddamani prosecuted complex, high-profile domestic terrorism and hate crimes cases, developing valuable legal and practical expertise on the issues of hate crimes, domestic terrorism, and threats. In her capacity as unit chief, Ms. Doddamani secured, for the first time, an official designee position in which she then served for the Michigan AG's office on the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF). Ms. Doddamani presented at the JTTF quarterly meetings on multiple occasions.

23. As a reflection of Ms. Doddamani's superior abilities as a prosecutor, and in addition to her specialized hate-crime and domestic-terrorism caseload, leadership in the Michigan AG's office assigned her to several significant matters. In the same year that she joined the office, for instance, Ms. Doddamani was assigned to work on the high-profile prosecution of state and local officials related to the Flint water crisis. She also was assigned to difficult homicide cases, such as a cold-case homicide in which the victim's remains had not been located, and she was specially designated to prosecute hate-crime homicides through the Wayne County Prosecutor's Office.

24. Ms. Doddamani was asked to serve as the Michigan AG's designee on multiple working groups and task forces. At the Michigan AG's request, Ms. Doddamani testified before the Michigan state legislature's government oversight committee regarding hate crimes and the formation of the Michigan AG's Hate Crimes Unit.

25. During her tenure with the Michigan AG's office, Ms. Doddamani identified and developed two complicated, groundbreaking prosecutions. Starting in 2020, she led a team of agents, including from the FBI, to investigate and prosecute a Michigan cell of the white supremacist Neo-Nazi accelerationist hate group, The Base. That successful state-court prosecution, which involved the use of a Michigan statute barring paramilitary training with firearms for civil disorder, was the first of its kind by any state with similar prohibitions in the nation.

26. At the same time, Ms. Doddamani led the prosecution of nine defendants, the so-called "Wolverine Watchmen," for their plot to kidnap the Michigan Governor. The case proceeded to trial in state court in two parts. Ms. Doddamani served as the lead prosecutor in the first trial in 2022, in which a jury convicted all three defendants, and she then helped prepare for the second trial, which occurred after she left the Michigan AG's office.[1] The state case marked the first use of a provision in Michigan's Anti-Terrorism Act that prohibits providing material support for terrorism. Ms. Doddamani also closely coordinated with the federal government in its efforts under the first Trump Administration to dismantle the Wolverine Watchmen, engaging on behalf

---

[1] The Michigan Court of Appeals recently vacated these convictions and remanded for further proceedings, holding that that kidnapping cannot serve as a predicate for the crimes for which the defendants were convicted. *See People v. Morrison*, No. 364651, 2026 WL 1673915, at *2 (Mich. Ct. App. June 9, 2026); *People v. Musico*, Nos. 364567, 364572, slip op. at 5 (Mich. Ct. App. July 20, 2026).

of the Michigan AG's office in the cooperation and coordination between state and federal law enforcement that gave rise to a parallel federal prosecution.

27. Both The Base and Wolverine Watchmen state-court cases involved conduct spanning multiple jurisdictions, and both resulted in the first gang classifications of, respectively, a terror cell and a private militia organization. Ms. Doddamani was commended for her work within the Michigan AG's office and by the FBI.

28. In January 2023, Ms. Doddamani joined the United States Attorney's Office for the Eastern District of Michigan as an AUSA. Ms. Doddamani was hired into the USAO's Civil Division with the understanding that the office intended to assign her cases in its Criminal Division as well.

29. Ms. Doddamani's performance reviews reflect that, after two decades as a criminal prosecutor, she quickly mastered her civil litigation docket. She earned outstanding work performance reviews each year with the USAO on the basis of her many accomplishments in that office.

30. In the Civil Division, Ms. Doddamani was assigned to work on several impactful civil rights enforcement cases. For instance, she was tasked with investigating a disability discrimination case against a major Michigan hospital system. In that case, Ms. Doddamani helped fight for and secure a favorable pre-lawsuit settlement requiring the health system to revise its practices and provide monetary relief for individuals previously harmed. As a Civil Division AUSA, Ms. Doddamani also defended the federal government in lawsuits brought against the second Trump Administration.

31. Throughout her tenure with the USAO, Ms. Doddamani was entrusted with representing the office through community outreach and presentations. Her performance reviews

noted that her "presentations were thoughtfully prepared, clearly and energetically presented, and well received. She received unanimously positive feedback and, as a result, she was a sought-after speaker." Office leadership praised Ms. Doddamani's abilities as a public representative of the USAO and, in 2023, granted her a discretionary performance award on those grounds.

32. As a reflection of her superb work and already-significant experience, USAO leadership repeatedly asked Ms. Doddamani to assume additional responsibilities. Despite her position as an AUSA in the office's Civil Division, on multiple occasions the USAO assigned Ms. Doddamani to help prosecute cases in the office's Criminal Division on top of her civil caseload. The distinction of taking on these dual duties was appropriately recognized in Ms. Doddamani's performance reviews, which noted that "[s]he successfully managed a large caseload and, unique among AUSAs in this office, simultaneously handled both civil and several criminal matters."

33. In 2023, Ms. Doddamani was assigned by USAO leadership to join the trial team in *United States v. Zastrow*, a prosecution of eight defendants for violations of the FACE Act, 18 U.S.C. § 248, and the federal civil rights conspiracy statute, 18 U.S.C. § 241. The assignment came just prior to indictment in the case, which had already been approved internally by USAO and DOJ leadership. Ms. Doddamani understood that she was being put on the team because of her extensive trial experience, particularly in cases involving multiple defendants. Ms. Doddamani carried out her duties as a trial team member under the supervision of USAO leadership. The case resulted in convictions of all eight defendants.

34. On April 13, 2026, Ms. Doddamani was abruptly and unlawfully terminated from her employment with the USAO and immediately removed from federal service. She had received no notification of any inquiry into her work product or performance, was given no cause for her termination, and was provided no opportunity to respond. Although the termination was

effectuated through a letter signed by then-Acting Attorney General Todd Blanche that cited "Article II of the United States Constitution and the laws of the United States" as authority for the firing, DOJ publicly announced that day that it had "terminated the employment of personnel responsible for weaponizing the FACE Act who still remained at the department," DOJ Rapid Response (@DOJRR47), *supra*, and the next day released a report excoriating prior FACE Act enforcement relating to reproductive health facilities.

**B. The Freedom of Access to Clinic Entrances Act**

35. The FACE Act prohibits individuals "by force or threat of force or by physical obstruction" from "interfer[ing] with or attempt[ing] to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1).

36. The statute prohibits the same range of conduct with regard to "exercise [of] the First Amendment right to religious freedom at a place of worship." *Id.* § 248(a)(2).

37. It also prohibits intentional or attempted damage or destruction of a facility "because such facility provides reproductive health services" or the intentional damage or destruction of the property of a place of religious worship. *Id.* § 248(a)(3).

38. Both civil and criminal remedies are available to enforce the FACE Act. *Id.* § 248(b)–(c).

39. Congress adopted the FACE Act in 1994 under its Commerce Clause power and its power to enforce the Fourteenth Amendment, Pub. L. No. 103-259, § 2, 108 Stat. 694, 694 (1994). The statute was a legislative response to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), which involved a suit against the anti-abortion

association Operation Rescue for conspiring to interfere with the rights of women seeking abortions and other services at reproductive health care clinics. S. Rep. No. 103-117, at 18 (1993).

40. Before *Bray*, numerous courts had issued injunctions restraining violence and blockades at reproductive health clinics pursuant to 42 U.S.C. § 1985(3), a Reconstruction Era statute that prohibits, among other things, conspiracies to deprive any person or class of persons of equal protection of the laws.[2]

41. But the *Bray* Court held that anti-abortion violence and intimidation do not entail the class-based invidious animus necessary to sustain a claim under the relevant portion of Section 1985(3). 506 U.S. at 268–74; *see also Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The Court also held that Section 1985(3) does not apply to anti-abortion violence and intimidation because such conduct is not aimed at a constitutional right that is protected against private infringement. *Bray*, 506 U.S. at 274–78; *see also United Bhd. of Carpenters, Loc. 610 v. Scott*, 463 U.S. 825, 833 (1983).

42. Congress responded by adopting the FACE Act to "fill" the "serious gap in the Federal laws" created by *Bray*'s narrowing of Section 1985(3). S. Rep. No. 103-117, at 18–19; *accord* H.R. Rep. No. 103-306, at 10 (1993).

43. Under Presidents of both parties—including during President Trump's first term and during the Biden Administration—DOJ prosecuted individuals under the statute's provisions that safeguard access to reproductive health services.[3] Prior FACE Act prosecutions enforced the

[2] *See, e.g.*, *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1360–61 (2d Cir. 1989); *Planned Parenthood Ass'n of San Mateo City v. Holy Angels Catholic Church*, 765 F. Supp. 617, 625–26 (N.D. Cal. 1991); *Sw. Med. Clinics of Nevada, Inc. v. Operation Rescue*, 744 F. Supp. 230, 233 (D. Nev. 1989); *Roe v. Operation Rescue*, 710 F. Supp. 577, 583–84, 589 (E.D. Pa. 1989), *aff'd on other grounds*, 919 F.2d 857 (3d Cir. 1990).

[3] *See, e.g.*, *United States v. Handy*, Criminal Action No. 22-96, 2023 WL 6199084, at *1 (D.D.C. Sept. 22, 2023); *United States v. Dugan*, 667 F.3d 84, 85 (2d Cir. 2011); *United States v. Weslin*,

statute against both anti-abortion activists[4] and abortion-rights advocates.[5] Indeed, during the Biden Administration, DOJ pursued multiple FACE Act prosecutions of prohibited conduct at crisis pregnancy centers. DOJ brought these cases under the FACE Act while also vigorously prosecuting violence and threats against places of worship and religious adherents under other federal hate crime and civil rights statutes.

### C. Coordinated Attacks on FACE Act Enforcement by the Trump Administration and Its Allies

44. For years, leaders of the anti-abortion movement and close allies of President Trump have worked to undermine enforcement of the FACE Act against anti-abortion activists, while preserving it as a tool to be wielded against abortion-rights advocates and to protect religious entities and adherents aligned with their views.

45. In advance of President Trump's return to the White House in 2025, the Heritage Foundation, a Washington, D.C.-based conservative think tank, spearheaded the *Project 2025 Presidential Transition Project*, a compendium of "policy prescriptions, agency by agency for the incoming President" that constituted a "unified effort to be ready for the next conservative

---

No. 06-cr-165, 2007 WL 316295, at *1 (D. Neb. Jan. 31, 2007); *United States v. Brock*, 863 F. Supp. 851, 855 (E.D. Wis. 1994); *see also* Criminal Complaint at 1, *United States v. Wiersma*, No. 18-cr-88 (N.D. Ill. Feb. 7, 2018), ECF No. 1.

[4] *See supra* note 2.

[5] *See, e.g.*, Press Release, U.S. Dep't of Just., Texas Defendant Pleads Guilty to Freedom of Access to Clinic Entrances (FACE) Act Violation (Jan. 16, 2025), https://perma.cc/SL7G-LN7X; Press Release, U.S. Dep't of Just., Florida Woman Convicted of Civil Rights Conspiracy Targeting Pregnancy Resource Centers (Dec. 20, 2024), https://perma.cc/QT3T-897W; Press Release, U.S. Dep't of Just., Ohio Woman Pleads Guilty to Freedom of Access to Clinic Entrances (FACE) Act Violation for Damaging Pregnancy Center (Dec. 8, 2023), https://perma.cc/J3PC-SWGD; Press Release, U.S. Dep't of Just., Wisconsin Man Sentenced to Prison for 2022 Firebombing of Madison Building (Apr. 10, 2024), https://perma.cc/MLQ8-2TGP (noting that a man was sentenced after pleading guilty to a violation of a different statute for throwing a Molotov cocktail at a building "because it was occupied by an organization that opposed abortion").

Administration to govern at noon, January 20, 2025." The Heritage Found., *Mandate for Leadership: The Conservative Promise* xiii (Paul Dans & Steven Groves eds., 2023) [hereinafter *Project 2025*], https://perma.cc/9FUW-FC3X. Although President Trump later disclaimed any knowledge of *Project 2025* or the individuals behind it, in an April 2022 speech, Trump had praised the Heritage Foundation and forecast that the organization was "going to lay the groundwork and detail plans for exactly what our movement will do." Isaac Arnsdorf, Josh Dawsey, and Hannah Knowles, *Trump Took a Private Flight with Project 2025 Leader in 2022*, Washington Post (Aug. 7, 2024), https://tinyurl.com/me37a4hy. Heritage Foundation president Kevin Roberts acknowledged in 2024 that he spoke to Trump directly about *Project 2025. Id.*

46. Crafted by "more than 50 (and growing) of the nation's leading organizations joining forces to prepare to seize the day," *Project 2025* functioned as "an invitation" to an "army of aligned, vetted, trained, and prepared conservatives to go to work on Day One to deconstruct the Administrative State." *Project 2025*, at xiv. It proposed a wholescale restructuring of the federal government's Executive Branch, including by overhauling or eliminating key agencies, centralizing power in the Presidency, and wiping out job protections for many government employees. And it took an especially firm stance against reproductive health freedoms, advocating for "pro-life and pro-family policies" that, among other things, would rescind federal funding and support for abortion care and would replace the federal Reproductive Healthcare Access Task Force with an anti-abortion task force. *Id.* at 6, 489.

47. As of February 2026, "[t]he Trump Administration ha[d] initiated or completed 53 percent of Project 2025's domestic administrative agenda"—283 of its 532 policy prescriptions. *Project 2025 Executive Action Tracker*, Ctr. for Progressive Reform, https://perma.cc/DVB5-FZW7 (last visited Aug. 15, 2026). The Trump Administration has exhibited particular fealty to

*Project 2025*'s policy prescriptions when it comes to reproductive health and rights. *See Year One of Project 2025: Tracking the Trump Administration's Devastating Campaign Against Sexual and Reproductive Health and Rights*, Guttmacher Inst. (Jan. 2026), https://perma.cc/J5WX-5YW8.

48. Not coincidentally, *Project 2025*'s contributors have taken key roles in the second Trump Administration. According to one analysis, 50 high-level administration officials, including 70 percent of the Cabinet, "have links to groups behind" *Project 2025*. Joe Fassler, *Mapped: 70 Percent of Trump's Cabinet Tied to Project 2025 Groups*, DeSmog (June 2, 2025, 09:30 PDT), https://perma.cc/ZF96-QR4G.

49. Among *Project 2025*'s key lieutenants was Gene Hamilton. *See Project 2025*, at 545. Hamilton authored Project 2025's chapter on DOJ, *id.*, after having served as a counselor to the Attorney General in the first Trump Administration and before returning as a Deputy White House Counsel for the first six months of the second Trump Administration. *See Leadership*, Am. First Legal, https://perma.cc/TWC2-PG6Q (last visited Aug. 15, 2026); Press Release, Am. First Legal, Gene Hamilton Returns to America First Legal as President Following Service as Deputy White House Counsel to President Donald J. Trump (June 24, 2025), https://perma.cc/46W2-Y2CD.

50. In 2021, Hamilton co-founded the conservative group America First Legal (AFL), which served as a member of *Project 2025*'s advisory board. *Leadership*, Am. First Legal, *supra*; *Project 2025*, at xi. His AFL co-founder was Stephen Miller, with whom Hamilton had worked in the first Trump Administration. At the time, Miller was the former Chief Speechwriter and a Senior Advisor to President Trump. He was named White House Deputy Chief of Staff for Policy and Homeland Security Advisor in the second Trump Administration. *See Leadership*, Am. First Legal, *supra*; *Stephen Miller*, Legistorm, https://perma.cc/7GEF-2447 (last visited Aug. 15, 2026).

51. Hamilton's *Project 2025* chapter specifically and prominently called for the curtailment of FACE Act enforcement. *Project 2025*, at 557–58. Identifying DOJ's FACE Act enforcement as an "egregious example" of "partisan and ideologically driven prosecution of . . . perceived political enemies," Hamilton falsely accused DOJ under President Biden of using the FACE Act "to harass pro-life demonstrators while not pursuing similar investigations of shocking acts of violence committed against pro-life pregnancy resource centers." *Id. But see supra* note 4 (listing FACE Act enforcement against both anti-abortion activists and abortion-rights advocates). He pointed to the prosecutions of "pro-life activist" Mark Houck for a purportedly "minor altercation" at a clinic in Pennsylvania and of Paul Vaughn "for allegedly participating in a peaceful protest at an abortion clinic" in Tennessee as examples of this supposed wrongdoing.[6] *Id.*

52. Hamilton called for "a thorough and holistic review of all DOJ activities" to enforce the FACE Act, "extend[ing] beyond ending" the alleged "absurd double standards embodied in the ongoing campaign of FACE Act prosecutions." *Project 2025*, at 558.

53. *Project 2025* was only one prominent example of AFL's and Hamilton's hostility to FACE Act enforcement against anti-abortion activists. Echoing *Project 2025*, Hamilton testified before the House Committee on the Judiciary's Select Subcommittee on the Weaponization of the Federal Government in May 2024, falsely accusing DOJ under President Biden of "prosecut[ing] numerous FACE Act cases while ignoring dozens of violent attackers on pregnancy care centers."

---

[6] In the Pennsylvania case, Houck was accused of pushing a 72-year-old volunteer at a Planned Parenthood clinic to the ground while he was escorting patients exiting the clinic. Press Release, U.S. Dep't of Just., Bucks County Man Indicted on Federal Charges for Assaulting a Reproductive Healthcare Clinic Escort (Sept. 23, 2022), https://perma.cc/UQ9Y-62B8. Vaughn was convicted for his role in a conspiracy to blockade an abortion clinic in Mount Juliet, Tennessee. Press Release, U.S. Dep't of Just., Six Defendants Convicted of Federal Civil Rights Conspiracy and Freedom of Access to Clinic Entrances (FACE) Act Offenses for Obstructing Access to Reproductive Health Services in Tennessee (Jan. 30, 2024), https://perma.cc/68F5-RVPN.

*Weaponization of the Federal Government: Hearing Before the H. Select Subcomm. on the Weaponization of the Fed. Gov't*, 118th Cong. 73 (May 15, 2024) (statement of Gene Hamilton, Exec. Dir., Am. Legal First).

54. In 2023, AFL submitted a complaint to DOJ's Office of Professional Responsibility (OPR) against the career attorneys who prosecuted *United States v. Houck*. In that criminal case, Houck was charged with two counts of violating the FACE Act for allegedly twice assaulting a 72-year-old volunteer escort at a Philadelphia reproductive health clinic. Indictment 2–4, *United States v. Houck*, No. 22-cr-323 ECF No. 1 (E.D. Pa. June 20, 2022). Based largely on the fact that a jury ultimately acquitted Houck, AFL baselessly accused the attorneys of engaging in a malicious prosecution. *See* Letter from Reed D. Rubinstein, Am. First Legal Found., to U.S. Dep't of Just., Off. of Pro. Resp. (Feb. 6, 2023), https://perma.cc/79QA-CRWT. AFL described the submission of its OPR complaint as part of its "investigation into Biden DOJ misconduct for targeting and intimidating pro-life Americans." Press Release, Am. First Legal, America First Legal Calls for Investigation into Biden DOJ Misconduct for Targeting and Intimidating Pro-Life Americans (Feb. 7, 2023), https://perma.cc/X9D4-UJMM (capitalization omitted).

55. Upon his return to office on January 20, 2025, President Trump and his administration took immediate action to implement the *Project 2025* blueprint and in particular to carry out *Project 2025*'s and AFL's calls to undermine FACE Act enforcement against anti-abortion activists.

56. On January 23, 2025, President Trump issued pardons to 24 individuals convicted of FACE Act violations during the Biden Administration. *Clemency Grants by President Donald J. Trump (2025–Present)*, U.S. Dep't of Just., Off. of the Pardon Att'y, https://perma.cc/J3ES-TP5T (last visited Aug. 15, 2026); Pres. Donald J. Trump, *Executive Grant of Clemency* (Jan. 23, 2025),

https://perma.cc/3348-GTVJ. Upon signing the pardons, Trump declared that the defendants "should not have been prosecuted." Katherine Doyle, *Trump Pardons Anti-Abortion Protestors a Day Before Annual March for Life Rally*, NBC News (Jan. 23, 2025, 5:25 PM), https://perma.cc/F4L9-T76J.

57. The following day, Chief of Staff to the Attorney General Chad Mizelle issued a memorandum on behalf of the Acting Associate Attorney General effectively prohibiting "abortion-related" FACE Act enforcement by DOJ. Memorandum from Chad Mizelle, Chief of Staff to the Att'y Gen. of the U.S., to Kathleen Wolfe, Supervisory Official of the C.R. Div. 1 (Jan. 24, 2025) [hereinafter Mizelle Memo], https://perma.cc/UY45-YQFB.

58. Echoing *Project 2025*'s false claims, the Mizelle Memo characterizes its policy changes as necessary because FACE Act prosecutions and civil actions are "the prototypical example" of "weaponization of the federal government." Mizelle Memo, at 1. It claims that "nearly all prosecutions under the FACE Act have been against pro-life protesters" despite alleged recent attacks against "more than 100 crisis pregnancy centers, pro-life organizations, and churches." *Id.*

59. The Mizelle Memo prohibits DOJ prosecutors from pursuing any "future *abortion-related* FACE Act prosecutions [or] civil actions" except in "extraordinary circumstances, or in cases presenting significant aggravating factors, such as death, serious bodily harm, or serious property damages." *Id.* (emphasis added). It further prohibits any "new abortion-related FACE Act actions—civil or criminal"—without authorization from the Assistant Attorney General for the Civil Rights Division. *Id.*

60. Thus, under the Mizelle Memo, DOJ attorneys retain ordinary authority to initiate civil and criminal FACE Act investigations and cases involving conduct directed at crisis pregnancy

centers and places of worship, while "abortion-related" FACE Act enforcement is all but prohibited.

61. Finally, the Mizelle Memo directed the dismissal of DOJ's ongoing FACE Act cases concerning prohibited conduct at health clinics that provide abortion services. *Id.*; *see also United States v. Connolly*, No. 24-cv-4467 (E.D. Pa.); *United States v. Zastrow*, No. 24-576 (M.D. Fla.); *United States v. Citizens for a Pro-Life Soc'y*, No. 24-cv-893 (N.D. Ohio).

62. In February 2025, President Trump issued Executive Order 14,202, entitled *Eradicating Anti-Christian Bias*. Exec. Order 14,202, 90 Fed. Reg. 9365 (Feb. 6, 2025). Once again parroting *Project 2025*'s misleading characterization of DOJ's FACE Act enforcement, the order accused DOJ under President Biden of engaging in "anti-Christian weaponization of government" by "engag[ing] in an egregious pattern of targeting peaceful Christians, while ignoring violent, anti-Christian offenses." *Id.* § 1, 90 Fed. Reg. at 9365. Specifically, the order falsely accused DOJ under President Biden of bringing FACE Act charges "and obtaining in numerous cases multi-year prison sentences against nearly two dozen peaceful pro-life Christians for praying and demonstrating outside abortion facilities," while "largely ignor[ing]" "violence, theft, and arson perpetrated against" Catholic churches, charities, and "pro-life centers." *Id.*

63. The *Anti-Christian Bias* order directed the establishment of a Task Force to Eradicate Anti-Christian Bias housed within DOJ and comprised of 17 principals from various federal departments and agencies. The order charged the Task Force to, among other things: (1) review the activities of federal departments and agencies for "any unlawful anti-Christian policies, practices or conduct . . . contrary to the purposes and policy of [the] order"; (2) recommend "steps to revoke or terminate any violative policies, practices, or conduct"; and (3) "recommend to the President, through the Deputy Chief of Staff for Policy [Stephen Miller] and the Assistant to the

President for Domestic Policy, any additional Presidential or legislative action necessary to rectify past improper anti-Christian conduct." *Id.* §§ 2, 3(a), 90 Fed. Reg. at 9366–67. The order also directed the Task Force to submit a series of reports to the President summarizing its work. *Id.* § 3(b), 90 Fed. Reg. at 9367.

64. By characterizing the Biden Administration's FACE Act enforcement as part of an "anti-Christian weaponization of government," *id.* § 1, 90 Fed. Reg. at 9365, the *Anti-Christian Bias* order tethered its policies and directives to the earlier-issued Executive Order 14,147, entitled *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025). Similar to the *Anti-Christian Bias* order, the *Weaponization* order called for "appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement." *Id.* § 2, 90 Fed. Reg., at 8235. The order directed the Attorney General, in consultation with department and agency heads, "to review the activities of all departments and agencies exercising civil or criminal enforcement authority" and to submit a report to the President recommending "appropriate remedial actions." *Id.* § 3(a), 90 Fed. Reg. at 8235.

65. Then-Attorney General Bondi issued a memorandum establishing a Weaponization Working Group to carry out the review required by the *Weaponization* order. Memorandum from Pamela Jo Bondi, Att'y Gen. of the U.S., to U.S. Dep't of Just. Emps. 1–2 (Feb. 5, 2025) [hereinafter Bondi Memo], https://perma.cc/BJ7C-X8DW. Bondi designated the Office of the Attorney General to lead the Working Group, with support from the Office of the Deputy Attorney General, the Office of Legal Policy, DOJ's Civil Rights Division, and the U.S. Attorney's Office for the District of Columbia. *Id.* at 1.

66. Bondi's memorandum claimed that no DOJ employee who "has acted with a righteous spirit and just intentions has any cause for concern about efforts to root out corruption and

weaponization." *Id.* But she warned that "the Department of Justice will not tolerate abuses of the criminal justice process, coercive behavior, or other forms of misconduct." *Id.* The memo specifically directed the Working Group to examine criminal prosecutions under the FACE Act for what Bondi characterized as "non-violent protest activity," among other topics. *Id.* at 2.

67. Consistent with this directive, the Working Group was comprised of issue-specific teams, many led by officials within the Office of the Deputy Attorney General. In addition to a "FACE Act" team, the Working Group included teams focused on, among other issues: elections; alleged cooperation between the federal government and the Office of the Manhattan District Attorney concerning its investigation of President Trump; the January 6, 2021, attack on the U.S. Capitol building; and President Biden's use of an autopen. The teams were instructed to submit memoranda on ideas for action within their topic areas, with a particular eye toward actions that could be accomplished solely by DOJ.[7]

68. On April 14, 2026, DOJ's Office of Legal Policy published a report with claims about the Biden Administration's alleged wrongdoing in its FACE Act enforcement. U.S. Dep't of Just., Off. of Legal Pol'y, *The Biden Administration's Weaponization of the Freedom of Access to Clinic Entrances Act* (2026) [hereinafter *FACE Act Report*], https://tinyurl.com/mp9vfvr8. The report points to the *Anti-Christian Bias* order and the Bondi Memo as its basis. *Id.* at 1. In a press release announcing the publication, DOJ described the report as a product of the Weaponization Working Group that had identified "selective prosecution based on beliefs" and other "inappropriate" prosecutorial conduct. Press Release, U.S. Dept. of Just., Justice Department Reveals the Biden Administration's Weaponization of Federal Law Against Pro-Life Americans (Apr. 14, 2026),

[7] *See DOJ Select Communications from Pardon Attorney Ed Martin*, DocumentCloud (July 14, 2026), https://tinyurl.com/3v79sw4f (documents obtained from DOJ through a Freedom of Information Act Request submitted by American Oversight).

https://perma.cc/T7ZT-Z3H3. The press release further cited President Trump's January 23, 2025, pardons and the Mizelle Memo as two actions taken explicitly to "rectify the[] wrongs" identified in the *FACE Act Report*. *Id.*

69. The *FACE Act Report* is an unusual document because it reveals internal communications that DOJ typically closely guards from public view. And although DOJ's nonpartisan Office of the Inspector General (OIG) traditionally is responsible for reviewing the Department's work for misconduct, OIG had no role in producing the *FACE Act Report*.

70. The *FACE Act Report* is "primarily a restatement of Project 2025's preordained conclusions," with "[t]he bulk of the 800-page document consist[ing] of anodyne emails among career attorneys—that is, people who serve across multiple administrations of both parties—which it spins into an unsubstantiated narrative of bias." Quinta Jurecic, *DOJ's First 'Weaponization' Report Is a Bust*, The Atlantic (Apr. 20, 2026), https://perma.cc/283F-2JEY.

71. Specifically, the report mischaracterizes the individuals prosecuted for FACE Act violations during the Biden Administration as "peaceful, pro-life defendants." *FACE Act Report* 1. In reality, those individuals engaged in violent acts such as firebombing[8] and arson,[9] coordinated blockades that prevented patients from entering clinics,[10] or made threats of violence.[11]

---

[8] Press Release, U.S. Dep't of Just., Former Marine Sentenced for Molotov Cocktail Attack Against Planned Parenthood Clinic in Orange County, California (Apr. 15, 2025), https://perma.cc/7D43-RG7V.

[9] Press Release, U.S. Dep't of Just., Illinois Man Sentenced for Setting Fire to Reproductive Health Services Facility (Aug. 15, 2023), https://perma.cc/QZ9K-YD6S.

[10] Press Release, U.S. Dep't of Just., Three Defendants Sentenced for Federal Civil Rights Conspiracy and Freedom of Access to Clinic Entrances Offenses (May 14, 2024), https://perma.cc/D269-FEL6 ("According to the evidence, Handy, Hinshaw, and Goodman – along with their co-conspirators – forcefully entered the clinic and set about blockading two clinic doors using their bodies, furniture, chains, and ropes.").

[11] Press Release, U.S. Dep't of Just., Ohio Man Sentenced to Prison for Threatening Reproductive Health Services Facility and an Individual Patient (June 29, 2022), https://perma.cc/826G-TNZK

72. The report repeats *Project 2025*'s emphasis on *United States v. Houck*, describing that prosecution as premised on a minor incident outside a Pennsylvania clinic. And similar to *Project 2025* and AFL's OPR complaint, the report offers the *Houck* case as an example of DOJ's overly aggressive FACE Act enforcement against a pro-life advocate. *FACE Act Report* 3, 5, 29–30.

73. The report also claims that DOJ under President Biden "largely ignored attacks on pro-life pregnancy resource centers," *id.* at 33, in favor of its preferred enforcement "in connection with pro-life demonstrations" and against "pro-life Christians," *id.* at 32. But as the report acknowledges, DOJ under President Biden brought several prosecutions regarding such conduct. *Id.* at 33–34; *see also supra* note 4. Indeed, those prosecutions concerning prohibited conduct at crisis pregnancy centers were groundbreaking. *See FACE Act Report* at 33 (quoting a Civil Rights Division official stating that he had a "very strong interest in charging" a case involving prohibited conduct at a crisis pregnancy center and noting that it "may be the first FACE case we bring with a pro-life victim").

74. It is true that DOJ has brought more FACE Act prosecutions concerning prohibited conduct at reproductive health clinics. But as Attorney General Merrick Garland explained during Senate testimony in 2023, whereas prohibited conduct at reproductive health clinics tends to occur during the day when patients, staff, and other witnesses are present, attacks on pregnancy resource centers tend to happen at night and in secret, making prosecution of such cases more challenging. *Oversight of the Department of Justice: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. 27–28 (2023) (statement of Merrick B. Garland, Att'y Gen. of the U.S.). To help address this information deficit, the FBI offered a $25,000 reward for help identifying individuals

(stating that in two separate telephone calls the defendant, who pleaded guilty, made a bomb threat to a reproductive health clinic and a death threat to an individual patient).

committing crimes against pregnancy resource centers. Press Release, Fed. Bureau of Investigation, FBI Offering $25,000 Rewards for Information in Series of Attacks Against Reproductive Health Service Facilities (Jan. 19, 2023), https://tinyurl.com/4dttxjt5.

75. The *FACE Act Report* also criticizes the Biden Administration for failing to bring any FACE Act prosecutions concerning places of worship. *FACE Act Report* 35. But until the second Trump Administration, DOJ had never charged a case under the statute's provisions safeguarding places of worship, based on concerns that those provisions are constitutionally infirm. *See* Regan Rush & Megan Marks, *Separating Fact from Fiction in FACE Act Enforcement*, Just Sec. (Apr. 14, 2026), https://perma.cc/EC5B-93P8. A draft of the *FACE Act Report* acknowledged a Civil Rights Division memo issued during President Trump's first term that warned prosecutors not to charge cases under the FACE Act's place-of-worship provisions; the final draft omits reference to that memo. *See* Sarah N. Lynch & Jacob Rosen, *Justice Department Releases Report Accusing Biden-Era DOJ of Uneven Enforcement of FACE Act Law*, CBS News (Apr. 14, 2026, at 16:21 EDT), https://perma.cc/Y3TW-Q6QX.

76. At the same time, DOJ, including under the Biden Administration, vigorously prosecuted violent acts and threats against places of worship and religious adherents under other better-tested statutes, such as 18 U.S.C. §§ 241, 247, and 249.[12]

[12] *See, e.g.*, Press Release, U.S. Dep't of Just., Texas Man Admits to Making Violent Threats Against Sikh Nonprofit Organization (Jan. 31, 2025), https://perma.cc/TU8T-ZVPA; Press Release, U.S. Dep't of Just., Missouri Man Pleads Guilty to Federal Civil Rights and Arson Charges for Setting Fire to Mormon Church, https://perma.cc/9REE-MADN; Press Release, U.S. Dep't of Just., Warren Man Pleads Guilty to Hate Crime Offense for Defacing Predominantly Black Church (Dec. 3, 2024), https://perma.cc/UE6U-G6M9; Press Release, U.S. Dep't of Just., Texas Man Sentenced for Hate Crimes Following Mass Shooting Targeting Muslims at Car Repair Shop (Apr. 3, 2024), https://perma.cc/39S7-ELK6; Press Release, U.S. Dep't of Just., Virginia Man Charged for Attempted Church Shooting (Mar. 28, 2024), https://perma.cc/S7UA-LDWV; Press Release, U.S. Dep't of Just., Ohio Man Sentenced to 18 Years in Prison for Firebombing a Church that Planned to Host Drag Show Events (Jan. 30, 2024), https://perma.cc/HRT6-VGJC;

77. Finally, the *FACE Act Report* contends that the Biden Administration advocated more lenient sentences in FACE Act prosecutions involving crisis pregnancy centers than those involving reproductive health clinics. *See FACE Act Report* 39–40. Consistent with its other criticisms, the report placed the blame for this purported uneven enforcement largely at the feet of the prosecutors and DOJ employees assigned to FACE Act matters as part of their employment duties. On the day of the *Face Act Report*'s release, then-Acting Attorney General Todd Blanche publicly declared that FACE Act prosecutors had been responsible for what he described as "completely inappropriate results" in FACE Act cases. U.S. Department of Justice (@TheJusticeDept), X (Apr. 14, 2026), https://tinyurl.com/22nuydwt. Summarizing "the work that we [the Weaponization Working Group] did over the past year at the Department," Blanche argued that "prosecutors have a big say in sentencing in the federal system" and that FACE Act prosecutors had "argu[ed] for really harsh sentences inconsistent with what they should have been doing and inconsistent with what they were arguing when it was exactly the opposite." *Id.*

78. But the *FACE Act Report*'s accusation of sentencing disparities ignores differences between the two categories of cases that called for different sentences under the U.S. Sentencing Guidelines. The cases cited in the report concerning reproductive health clinics "involved coordinated, multi-defendant conspiracies designed to physically block access to medical facilities" that in some instances resulted in injury to clinic staff and oftentimes involved repeat offenders. Rush & Marks, *supra*. In contrast, the cases concerning crisis pregnancy centers "arose from nighttime vandalism" and entailed no "direct confrontation." *Id.* And the relevant facts

---

Press Release, U.S. Dep't of Justice, Jury Recommends Sentence of Death for Pennsylvania Man Convicted for Tree of Life Synagogue Shooting (Aug. 2, 2023), https://perma.cc/6KZ6-S76X.

supported only misdemeanor charges in two out of the three cases concerning crisis pregnancy centers. *Id.*

79. On April 30, 2026, the Task Force on Anti-Christian Bias issued a report setting forth several examples of supposed anti-Christian bias by the Biden Administration. *See* Task Force to Eradicate Anti-Christian Bias, *Eradicating Anti-Christian Bias Within the Federal Government* (2026), https://perma.cc/8V6K-2JHE. The report's discussion of FACE Act enforcement during the Biden Administration summarizes the *FACE Act Report*'s findings. *See id.* at 37–41. For example, the Task Force's report reprises the finding that DOJ under the Biden Administration "pursued aggressive [FACE Act] prosecutions against non-violent, pro-life, Christian demonstrators" but at the same time "responded less aggressively to violent attacks against pregnancy resource centers." *Id.* at i. The report also highlights the role of career prosecutors in the claimed weaponization of the FACE Act, including by discussing prosecutorial decisionmaking in *United States v. Houck* and select other cases. *Id.* at 38–39.

**D. Ms. Doddamani Is Terminated Without Advance Notice or Cause for Working on a FACE Act Prosecution**

80. On April 13, 2026, Ms. Doddamani was on annual leave when she received a phone call from the Administrative Officer and head of security at the Eastern District of Michigan USAO, who informed Ms. Doddamani that she had been terminated and told her to check her email. That morning, an email had been sent to Ms. Doddamani's DOJ and personal email accounts from an attorney-adviser with DOJ's Justice Management Division, Office of Human Capital, based in Washington, D.C. The subject line of the email read, "Acting AG Notification of Your Removal – Effective Immediately."

81. Attached to the email was a one-page memorandum with the filename "Doddamani Removal Letter." The memorandum, entitled "Memorandum for Sunita G. Doddamani" and addressed to Ms. Doddamani from DOJ Acting Attorney General Todd Blanche, stated:

Subject: Notice of Removal from Federal Service

> This memorandum provides official notice that you are removed from your position of Assistant United States Attorney, AD-0905-29, Civil Division, United States Attorney's Office for the Eastern District of Michigan, and from the federal service, effective immediately.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately.
>
> If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of the removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

Ex. A.

82. The letter was signed by then-Acting Attorney General Blanche and dated that same day, April 13, 2026.

83. The DOJ Standard Form 50 (SF50) Notification of Personnel Action reflecting Ms. Doddamani's termination similarly lists "ART II CONSTITUTION" as the legal authority for her removal. Ex. B.

84. Prior to receiving the April 13, 2026, email and termination memorandum, Ms. Doddamani had received no notice of, or opportunity to respond to, the removal decision. Soon after receiving the termination memorandum, Ms. Doddamani became aware that her DOJ email and telephone access had been suspended.

85. After reviewing the email and termination memorandum, Ms. Doddamani arranged to go to the USAO the following day to pack up her office and turn in her government-issued devices.

Security personnel apologized when they met Ms. Doddamani at the office entryway, telling her they had found out about her termination shortly before it had happened. During that visit, Ms. Doddamani was escorted at all times and was told that she was prohibited from communicating with people in the office. USAO leadership never spoke with Ms. Doddamani about her termination.

86. On information and belief, United States Attorney Jerome Gorgon convened a meeting on April 13 with USAO managers at which he claimed that Ms. Doddamani and another career AUSA had been fired for "misconduct," to the surprise and disbelief of the meeting attendees. At the same time, Gorgon professed to have no prior knowledge of the terminations or the reason for them.

87. USAO leadership has never told Ms. Doddamani that her performance was unsatisfactory. None of her supervisors, or any other official in DOJ or USAO leadership, ever raised any concerns with Ms. Doddamani about her cases, work product, or any other issues relating to her work performance or employment. She received an "outstanding" rating, the highest possible, in the review period immediately prior to her termination. Although Ms. Doddamani was able to secure new employment as of April 27, 2026, her termination from federal service deprived her of several days of pay and benefits. Moreover, the fact and circumstances of her termination risk jeopardizing her present or future employment and financial opportunities, and have impugned her reputation.

88. On the same day that Ms. Doddamani received the termination memorandum, other career DOJ prosecutors who had been involved in FACE Act prosecutions were also terminated. *See* Sarah N. Lynch & Jacob Rosen, *DOJ Fires at Least 4 Prosecutors Involved in FACE Act*

*Cases During Biden Administration*, CBS News (Apr. 13, 2026 at 19:05 ET), https://perma.cc/V32P-74LE.

89. Also on April 13, 2026, DOJ announced in statements to the press and on social media that it had "terminated the employment of personnel responsible for weaponizing the FACE Act who still remained at the department." *Id.* (quoting a Justice Department spokesperson); DOJ Rapid Response (@DOJRR47), *supra*.

90. The day after Ms. Doddamani's termination, DOJ's "Weaponization Working Group" publicly released the *FACE Act Report*, which criticized the *United States v. Zastrow* prosecution as driven by the interests of "abortion NGOs" and involving "blatant anti-Christian bias." *FACE Act Report* 22 (capitalization omitted). All eight defendants in the case had received pardons from President Trump on January 23, 2025, among the 24 FACE Act defendants pardoned that day. *See Clemency Grants by President Donald J. Trump (2025–Present)*, *supra*.

91. DOJ's public statements, the timing of Ms. Doddamani's termination, and the release of the *FACE Act Report* make clear that Ms. Doddamani's role in the *United States v. Zastrow* prosecution was the basis for her termination.

92. Unlawful terminations are a frequent tool of the Trump Administration to achieve its political aims. DOJ officials have repeatedly attempted to justify firings and workforce reductions by portraying the employees targeted as culpable for the now-disfavored cases they had been assigned. For instance, in a March 3, 2025, interview, then-Attorney General Pamela Jo Bondi affirmed that she had fired prosecutors associated with the criminal cases against President Trump. Bondi added that she and other officials would identify DOJ employees "who despise Donald Trump, despise us, don't want to be there" and would "root them out . . . and they will no longer be employed." *AG Pam Bondi on Epstein Files: 'The Public Has a Right to Know,'* Fox News, at

6:40-7:15 (Mar. 3, 2025), https://perma.cc/CFX7-N2JH. Bondi continued to carry out her threat, later firing multiple prosecutors involved in cases stemming from the January 6, 2021, attack on the U.S. Capitol. *DOJ Abruptly Fires 3 Prosecutors Involved in Jan. 6 Criminal Cases, AP Sources Say*, PBS (June 28, 2025, 11:48 AM), https://perma.cc/W7KU-PEJK.

93. Then-Deputy Attorney General Todd Blanche similarly touted that DOJ and FBI had "cleaned house" of employees who worked on cases involving President Trump, citing the departure of roughly 200 DOJ employees through firings or voluntary departures. Rebecca Beitsch, *Blanche Boasts of Having 'Cleaned House' at DOJ, FBI Following Trump Prosecutions*, The Hill (March 26, 2026, 1:19 PM), https://thehill.com/homenews/administration/5802553-todd-blanche-cpac-doj-fbi-firings/. And in a November 7, 2025, interview with AFL's Hamilton, Blanche described the complete dismantling of DOJ's Public Integrity Section, the unit responsible for prosecuting public corruption, as an appropriate remedy for the past "mistakes" of that unit. America First Legal, *AFL President Gene Hamilton Moderates a Federalist Society Fireside Chat with Deputy AG Todd Blanche*, YouTube, at 30:30-31:15 (Nov. 14, 2025), https://tinyurl.com/mtxf6ksy; *2025 National Lawyers Convention: New Legal Frontiers*, The Federalist Society, https://tinyurl.com/4brktvd9 (last visited Aug. 15, 2026).

94. Ms. Doddamani's role in *United States v. Zastrow* was carried out in accordance with her professional and ethical obligations, and it was carried out at the direction and under the supervision of the USAO leadership that had assigned her to the trial team. Consistent with the understanding that she had been assigned to that multi-defendant case based on her extensive trial experience, Ms. Doddamani helped handle arraignments and bond hearings for several defendants and filed complex pre-trial motions. At trial, Ms. Doddamani presented the government's first witness, who provided a compelling account of the defendants' criminal conduct and its impact on

the victims, examined several other witnesses, and addressed the jury in rebuttal argument. Ms. Doddamani had also been assigned, and was prepared to conduct, the cross-examination of the lead defendant had he elected to testify.

95. On August 20, 2024, after one defendant pled guilty pre-trial and following a three-week trial, a jury found the remaining seven defendants in *United States v. Zastrow* guilty of the FACE Act and conspiracy charges. President Trump pardoned all eight defendants before they could be sentenced by the trial court.

**E. Seeking Relief from the Merit Systems Protection Board Would Be Futile**

96. In the normal course of proceedings, Ms. Doddamani would be able to seek recourse for some—though not all—of her claims through the Merit Systems Protection Board (MSPB). But seeking relief in that forum would be futile.

97. Congress enacted the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq.*, to provide a uniform scheme for administrative and judicial review of personnel actions against covered federal employees and to ensure an apolitical civil service for the good of the American people. The CSRA sets forth protections and remedies available to covered employees who face adverse employment actions, as well as a procedural process to vindicate their rights. When federal employees seek relief from an action covered by the CSRA, they follow the prescribed process for administrative and judicial review and generally may not challenge a covered adverse employment action in federal court in the first instance.

98. The CSRA established the MSPB as an independent agency consisting of three members, each appointed by the President with advice and consent of the Senate to serve seven-year terms. *Id.* §§ 1201, 1202(a)–(c). Under the CSRA, the President can remove MSPB members only for cause. *Id.* § 1202(d).

99. The MSPB is a quasi-judicial body, adjudicating conflicts between civil servants and their employing agencies. It was designed to resolve disputes including, among other things, allegations that their government employer subjected them to an unlawful employment action or prohibited personnel practice. 5 U.S.C. §§ 1204(a)(1), 1221, 2302(b)(1), (8), 7512.

100. To ensure the MSPB's independence and that it remains free from partisan influence or the appearance thereof, the CSRA permits no more than two members of the Board to be from the same political party. 5 U.S.C. § 1201. The seven-year term for MSPB members further insulates the Board from partisan influence by exceeding the length of a single presidential term.

101. The MSPB, as presently constituted, does not function as designed.

102. On February 10, 2025, President Trump fired MSPB Chairman Cathy Harris without cause with three years remaining on her term, in violation of the CSRA's for-cause-removal provision. The D.C. Circuit upheld Ms. Harris's removal, holding that "Congress may not restrict the President's ability to remove MSPB members." *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025). On June 30, 2026, the Supreme Court denied Ms. Harris's petition for a writ of certiorari, cementing Ms. Harris's removal and leaving the MSPB no longer the independent body that Congress created through the CSRA.

103. The blow to the MSPB's independence is heightened by President Trump's Executive Order prohibiting any Executive Branch employee, including members of putatively "independent" agencies like MSPB from "advanc[ing] an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General." *Ensuring Accountability for All Agencies*, Exec. Order 14,215, § 7, 90 Fed. Reg. 10447, 10448–

49 (Feb. 24, 2025); *see also id.* §§ 4–6, at 10448 (setting forth requirement to ensure that putatively independent agencies' "obligations" reflect "consistency with the President's policies and priorities'). With the CSRA's for-cause-removal provision essentially a dead letter, MSPB members know that any decision inconsistent with the President's preferences will be their last.

104. Indeed, in several materials, including on its website and in job postings, the MSPB no longer describes itself as an "independent" agency. Drew Friedman, *After Slaughter Decision, MSPB No Longer Calling Itself 'Independent'*, Federal News Network (July 21, 2026), https://perma.cc/B3P5-9JMS. A Board spokesperson confirmed that "[t]he word 'independent' is being removed from public-facing agency descriptions in light of recent legal developments and the Supreme Court's decision in [*Trump v. Slaughter*]," which struck down a federal law providing removal protections for Federal Trade Commission members. *Id.*; *see also Slaughter,* 609 U.S. ----, 146 S. Ct. 2283, 2304 (2026).

105. President Trump also has eliminated MSPB's partisan balance. MSPB Acting Chairman Henry Kerner was appointed by President Biden in 2023 as a Republican member and was sworn in to the Board on June 3, 2024. *Board Members*, U.S. Merit Sys. Protections Bd., https://perma.cc/2YZW-VFVN (last visited Aug. 15, 2026).

106. President Trump nominated James Woodruff II to be a second Republican MSPB member. The Senate confirmed Woodruff on October 7, 2025, and he was sworn in to the Board on October 28, 2025. *Id.*; Sean Michael Newhouse, *Federal Employee Appeals Board Gets Quorum After Senate Confirms New Member*, Gov't Exec. (Oct. 8, 2025), https://perma.cc/4GPR-QAKX.

107. MSPB member Raymond Limon, a Democratic member, retired on February 28, 2025. Press Release, U.S. Merit Sys. Protection Bd., Member Raymond A. Limon Retiring (Feb.

28, 2025), https://perma.cc/AU5S-6N4P. The seat vacated by Mr. Limon remains vacant, *see Board Members*, *supra*, and President Trump has not nominated anyone to fill the position, *see, e.g.*, *Pending Nominations on the Executive Calendar*, U.S. Senate, https://www.senate.gov/legislative/nom_cal_civ.htm [https://perma.cc/JV9W-99BC] (last visited Aug. 15, 2026). The MSPB is thus operating without any Democratic member or any prospect of having one.

108. Ms. Doddamani cannot obtain a fair hearing from the MSPB, given that its Board is stacked with President Trump's co-partisans who understandably fear removal from office if they second-guess Defendants' decision to terminate Ms. Doddamani's employment.

109. Beyond President Trump's evisceration of the MSPB's independence and partisan balance, the United States has argued—and the MSPB has held—that the CSRA does not apply to so-called "Article II terminations" like Ms. Doddamani's and that the Board therefore lacks jurisdiction over appeals challenging such adverse actions. *Jackler & Jaroch Consolidation v. Dep't of Just.* (*Jackler & Jaroch*), 2026 M.S.P.B. 3, 6–7 (2026), *appeal docketed*, No. 26-1575 (Fed. Cir. Mar. 26, 2026). That MSPB ruling came amidst enormous private and public pressure from Trump White House officials on the MSPB—including directly on Mr. Kerner, its chairman—to permit the "Article II terminations." Jonah Bromwich, Michael Schmidt, and Rebecca O'Brien, *White House Secretly Swayed Board Meant to Stop Civil Service Politicization*, NYTimes (June 28, 2026), https://tinyurl.com/yrvuvamm.

110. Defendants and the MSPB have maintained the same position on "Article II terminations" with regard to Ms. Doddamani. To preserve her rights and remedies, Ms. Doddamani filed a timely appeal with the MSPB challenging her termination. Ex. C, Notice of Appeal, *Doddamani v. Dep't of Just.*, Docket No. CH-0752-26-0383-I-1 (M.S.P.B. May 21, 2026),

Tab 1. The MSPB dismissed her appeal without prejudice, relying on *Jackler & Jaroch*. Ex. D, Initial Decision, *Doddamani* (May 26, 2026), Tab 8. Supporting that decision, the United States argued that "Assistant United States Attorneys (AUSA) like [Ms. Doddamani] wield significant executive authorities on behalf of the United States and are removable at-will under Article II." Ex. E, Agency's Response to Order to Show Cause, at 2, *Doddamani* (May 21, 2026), Tab 5.

111. As every court that has considered the issue has recognized, if the Board lacks authority to review so-called "Article II terminations," that does not mean that Ms. Doddamani's only avenue to challenge her termination is to pursue a futile appeal before the MSPB. Instead, federal district courts like this one are the proper forum. *Comey v. U.S. Dep't of Just.*, No. 25-cv-7625, 2026 WL 1142679, at *11 (S.D.N.Y. Apr. 28, 2026); *Comans v. Exec. Off. of the President*, 2026 WL 1132803, at *5 (E.D. Va. Apr. 15, 2026) ("It follows that because the MSPB has no jurisdiction, this Court necessarily has federal question jurisdiction . . . .").

## JURY TRIAL DEMANDED

112. Plaintiff demands a jury trial on each and every claim for which a jury trial is available.

## CAUSES OF ACTION

### <u>Count I</u>
### Violation of the Civil Service Reform Act of 1978, 5 U.S.C. §§ 2301, 2302, 7513

113. During her tenure in the U.S. Attorney's Office for the Eastern District of Michigan, Ms. Doddamani was a member of the "excepted service" covered by the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. §§ 2302(a)(2)(B), 7511(a)(1)(C).

114. Among other things, the CSRA requires federal personnel management to comply with certain "merit system principles," including that employees "receive fair and equitable treatment . . . without regard to political affiliation" and "with proper regard for their . . . constitutional rights." *Id.* § 2301(b)(2). The CSRA further provides that employees must be

"retained on the basis of the adequacy of their performance," *id.* § 2301(b)(6), and should be "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," *id.* § 2301(8)(A).

115. The CSRA prohibits discriminatory removals on the basis of "political affiliation," *id.* § 2302(b)(1)(E), or "conduct which does not adversely affect the performance of the employee . . . or the performance of others," *id.* § 2302(b)(10); *see also id.* §§ 2302(a)(iii), 7512(1) (defining "removal" as a "personnel action" covered by the CSRA).

116. A removal is permissible under the CSRA "only for such cause as will promote the efficiency of the service." *Id.* § 7513(a).

117. An employee against whom removal is proposed is entitled to "at least 30 days' advance notice"; "a reasonable time, but not less than 7 days, to answer orally and in writing"; representation by "an attorney or other representative"; and "a written decision and the specific reasons" for their termination. *Id.* § 7513(b).

118. Defendants, in directing and authorizing Ms. Doddamani's termination without the statutorily mandated cause or advance notice, violated the CSRA.

119. In addition, Defendants violated the CSRA by directing and authorizing Ms. Doddamani's termination on an arbitrary, capricious, and discriminatory basis—namely, because she worked on a FACE Act prosecution at her superiors' direction that the current Administration opposed on partisan grounds—and not for reasons related to her performance or in the interests of the efficiency of the Department of Justice.

120. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.

**Count II**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1) and 706(2)**

121. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

122. Defendants, in authorizing and signing Ms. Doddamani's termination memorandum on April 13, 2026, unlawfully withheld the due process owed to Ms. Doddamani and implemented a final agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "unsupported by substantial evidence," and "unwarranted by the facts." 5 U.S.C. § 706.

123. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.

**Count III**
***Ultra Vires* Action**

124. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

125. This Court has inherent equitable power to enjoin unconstitutional actions by the Executive Branch. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

126. No part of the U.S. Constitution, statute, or other source of law authorized Defendants to terminate Ms. Doddamani from the federal service without adhering to the statutory protections afforded to her. Her termination was therefore *ultra vires* and without legal force or effect.

127. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.

**Count IV**
**First Amendment – Retaliation Based on Perceived Political Affiliation and Beliefs**

128. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

129. "The First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990); *see also Elrod v. Burns*, 427 U.S. 347, 359 (1976) (holding that "[t]he threat of dismissal" based on political affiliation "unquestionably inhibits protected belief and association").

130. The First Amendment's restrictions on terminations based on partisan affiliation apply even when the government acts based on an incorrect perception of an employee's politics. The government's "motive" is what triggers First Amendment protections in this context, *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016), not "an employee's *actual* . . . exercise of constitutional rights," *id.* at 269–70 (citation omitted).

131. Defendants terminated Ms. Doddamani's employment based solely on her participation in the *United States v. Zastrow* prosecution, which formed their perception that she is politically affiliated with opponents of President Trump and the Trump Administration and with the pro-choice movement and that she harbors anti-Christian and pro-abortion political beliefs.

132. No government interest of "vital importance" can support Ms. Doddamani's removal based on her perceived political affiliation and beliefs. *Elrod*, 427 U.S. at 362.

133. Termination of Ms. Doddamani's employment based on her perceived political affiliation and beliefs is not the means "least restrictive of freedom of belief and association" of achieving any interest that Defendants might assert in attempting to justify their conduct. *Id.* at 363.

134. Any benefit that Defendants might assert in attempting to justify Ms. Doddamani's termination does not "outweigh the loss of constitutionally protected rights." *Id.*

135. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.

**Count V**
**Fifth Amendment's Due Process Clause (Property Interest)**

136. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

137. The Fifth Amendment protects against deprivation of a property without due process of law.

138. Because the CSRA provides that Ms. Doddamani's employment is terminable only for cause, 5 U.S.C. § 7513(a), she has a protected property interest in her continued employment with the United States Attorney's Office for the Eastern District of Michigan, *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985).

139. Ms. Doddamani received no notice or opportunity to be heard before she was terminated.

140. Upon information and belief, Ms. Doddamani was not subject to investigation by DOJ's Office of the Inspector General or Office of Professional Responsibility or any other independent watchdog prior to or since her termination.

141. Defendants' actions to terminate Ms. Doddamani's employment without due process unlawfully deprived her of that property interest.

142. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to lost or jeopardized present or future financial opportunities and reputational harm.

**Count VI**
**Fifth Amendment's Due Process Clause (Liberty Interest)**

143. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

144. The Fifth Amendment's Due Process Clause protects against deprivation of liberty without due process of law.

145. A federal employee has a liberty interest against reputational harm caused by a government actor when that harm is accompanied by another "more tangible interest such as employment." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

146. Defendants terminated Ms. Doddamani's employment for purportedly "weaponizing the FACE Act." DOJ Rapid Response (@DOJRR47), *supra*. By accusing her of prosecuting cases based on partisan political considerations instead of on the law and the facts, Defendants impugned Ms. Doddamani's reputation.

147. In addition, Defendants' actions have caused the loss of Ms. Doddamani's government employment and have harmed her future employment prospects. Ms. Doddamani will also forever be required to report her unlawful termination on applications for employment and security clearances.

148. As a DOJ employee within the federal service, Ms. Doddamani was entitled by statutes, regulations, and the Fifth Amendment to protections against deprivation of her liberty

interest without the process required by law. The lack of any due process accorded to Ms. Doddamani deprived her of the ability to challenge the accuracy of any evidence that allegedly serves as the basis for her removal, if any even exists, as well as to protect her reputation.

149. A background check by any future employer is likely to reveal information about Ms. Doddamani related to her termination that is inaccurate and false and that will adversely affect her reputation and chance for additional employment opportunities.

150. Ms. Doddamani suffered adverse and harmful effects from her termination, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.

**Count VII**
**Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202**

151. Plaintiff repeats and realleges all of the foregoing paragraphs as if fully set forth herein.

152. Ms. Doddamani is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Ms. Doddamani and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Defendants have no authority to remove Ms. Doddamani on the basis of her perceived political affiliation and beliefs and without affording her all rights and protections set forth by applicable statutes and regulations.

**PRAYER FOR RELIEF**

Plaintiff Sunita Doddamani respectfully requests the following relief:

a. A declaration that Defendants violated the Civil Service Reform Act;

b. A declaration that Defendants violated the Administrative Procedure Act;

c. A declaration that Defendants violated Ms. Doddamani's Fifth Amendment due process and statutory rights;

d. A declaration that Defendants violated Ms. Doddamani's First Amendment right against retaliation based on her perceived political affiliation;

e. An order requiring the Government to reinstate Ms. Doddamani and correct any records indicating that Ms. Doddamani committed misconduct or that she was removed from the federal service under Article II; and enjoining the Government from taking any further adverse personnel action against Ms. Doddamani without providing appropriate procedural and substantive due process, as required by law, including the Civil Service Reform Act and the Fifth Amendment;

f. An award of backpay and other monetary and administrative relief as appropriate under the Civil Service Reform Act;

g. An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

h. Such other and further relief that the Court may deem fit and proper.

August 17, 2026

Respectfully submitted,

*/s/ Julia Gegenheimer*
Julia Gegenheimer
Jonathan L. Backer
Rupa Bhattacharyya
Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6671

*Attorneys for Plaintiff*